MURRAY, J.,
Concurs in Part and Dissents in Part With Reasons.
hFor the reasons that follow, I concur in the majority’s affirmation of the trial court’s award of $253,699 in damages for Neal’s business income loss covered under the Lafayette policy. I also concur in the affirmation of the trial court’s conclusion that Lafayette breached its statutory duties of good faith and fair dealing in handling Neal’s claim. I find, however, that the record does not support the jury’s conclusion that this breach caused additional damages to Neal; I therefore dis *1148 sent from the majority’s re-assessment and award of such damages. I also dissent from the majority’s determination of the penalties assessed to Lafayette for its breach.
Regarding the business income loss, two experts testified. Mr. Litcolff, who was retained by the plaintiff, opined that Neal incurred a business income loss of $438,311,[1] which included $253,699 in net income, plus $400,496 in continuing normal operating expenses, less a $216,000 co-insurance penalty. The defendant’s expert, Mr. Balfour, opined that Neal had suffered no business income loss.
| ¡,As the majority notes, the Lafayette policy states that it “will pay for the actual loss of Business Income” sustained by the insured “due to the necessary suspension of [the insured’s] ‘operations’ during the ‘period of restoration’.” The “period of restoration” is defined in the policy as beginning on the date of the loss-causing event and ending on the date when the property “should be repaired, rebuilt or replaced.”[2] The record shows that a key difference, which accounted for the disparity between the opinions of the two experts, was that Mr. Litcolffs method for determining income loss excluded any 2005 income Neal received after the period of restoration; whereas, Mr. Balfour’s method did not.
Mr. Balfour first calculated Neal’s annual income in 2005, including the income from the December 2005 auction Neal held while still operating out of its temporary location in Jackson, Mississippi. Then, because Neal’s annual income in 2005 was more than it had been in 2004 or the preceding years, Mr. Balfour opined that Neal had not suffered any business income loss as a result of the disruption of its business operations at the Magazine Street location covered by the Lafayette policy. Mr. Balfour further testified that because there was no business income loss, there was no reason for him to calculate the period of restoration.
Conversely, Mr. Litcolff first determined that there were 91 days in the period of restoration, which began on September 1, 2005 and ended on November 30, 2005 (the date all parties agreed that Neal’s Magazine Street location was fit for occupation, although Neal did not actually return to that location until about two weeks later). Mr. Litcolff then calculated Neal’s average daily net income during the first six months of 2005, and multiplied that per diem figure by 91 to account for the 91 days in the period of restoration, arriving at a net income loss of $253,699. He then calculated the normal operating expenses for the period of restoration, added that figure to the net income loss, and subtracted the cojmsurance3 penalty, to come up with a total business income loss of $438, 311. Because Mr. Litcolffs method did not require him to consider income earned or expenses incurred after the period of restoration, he did not take into account the profit Neal earned from the December 2005 auction.
The business income loss determined by the jury exactly matches the figure given by Mr. Litcolff as Neal’s net income loss. Considering the policy language, I cannot say the jury was manifestly erroneous in choosing to adopt this figure. In this instance it seems that the policy language, *1149 particularly the provision defining the “period of restoration,” may not be precisely tailored to a business such as Neal’s (in which income is generated only when an auction is held, approximately six times per year); however, Lafayette wrote the policy and is responsible for its contents. I therefore concur in the majority’s affirmation of the $253,699 award for business income loss.
I also concur in the majority’s affirmation of the trial court’s conclusion that Lafayette violated La. R.S. 22:1220, which imposes upon insurers twin duties of good faith and fair dealing in the handling of claims and prescribes penalties for an insurer’s breach of either duty. As quoted in the majority opinion, Part B of the statute lists six specific acts, and provides that an insurer’s knowing commission of any one of the six constitutes a breach of the statute. In the instant case, the jury was presented with two interrogatories regarding Lafayette’s commission of the acts enumerated in 22:1220. The jury answered “yes” to both interrogatory # 7 (Did Lafayette Insurance Company misrepresent any pertinent facts or insurance policy provisions relating to any coverages at issue?”) and interrogatory # 9 (Do you find by a preponderance of the evidence that Lafayette Insurance Company was arbitrary, capricious or without probable cause in failing to pay any amount owed for business income loss or extra expense at 4038 Magazine Street within 6014days of satisfactory proof of loss?). On appeal, Lafayette argues that the jury was clearly wrong in finding Lafayette guilty of misrepresentation under the statute because at the time it initially denied Neal’s claim, Lafayette was not aware that there had been an onsite cause for Neal’s power loss, which was covered under the policy.
The majority rejects Lafayette’s argument. Although I do not agree that with the majority’s assertion that Lafayette “made multiple policy misrepresentations”,[3] I conclude that whether or not Lafayette violated this prong of 22:1220 B is irrelevant because Lafayette clearly committed one of the other enumerated acts — that is, it knowingly and without apparent reason did not remit Neal’s “extra expenses” until more than sixty days after Neal’s February, 2007 deposition, at which time, by Lafayette’s own admission, it learned there had been an onsite cause for the loss of power, thus triggering coverage.[4] Significantly, Lafayette does not assign as error on appeal the jury’s affirmative response to interrogatory # 9, other than to argue generally that Lafayette did not behave arbitrarily or capriciously in denying benefits; however, Lafayette’s failure to provide any explanation for its four-month delay in paying Neal’s extra expenses equates to arbitrary and capricious behavior. For this reason, I concur in the majority’s conclusion that Lafayette violated La. R.S. 22:1220, thereby entitling Neal to recover statutory penalties as well as any damages caused by Lafayette’s breach.
The jury was presented with three follow-up interrogatories to be answered in the event they determined that Lafayette’s had committed a breach of duty under La. R.S. 22:1220. Interrogatory # 10 stated: “If you answered “YES” to Questions |s3, 7, or 9, do you find by a preponderance of *1150 the evidence that Neal Auction Company-suffered actual damages as a result of Lafayette Insurance Company’s actions?”[5] The jury responded affirmatively to interrogatory # 10. Interrogatory # 11 stated: “If you answered “YES” to Question 10, then what amount of damages do you find Neal Auction Company suffered as a result of Lafayette Insurance Company acting in an arbitrary or capricious manner or without probable cause?” The jury’s response to this interrogatory was “$500,000.” The final interrogatory, # 12, stated: “What amount of penalty, if any, you award [sic] to Neal Auction Company for Lafayette’s breach of its duties as an insurer?” The jury’s response was “$5,000.”
The majority concludes that the jury’s assessment of $500,000 in damages as a result of Lafayette’s breach of its duties under La. R.S. 22:1220 is beyond the amount that a reasonable fact finder could assess given the evidence, and then reduces the amount to $412,312. I agree that the jury’s finding of $500,000 in damages is clearly wrong. However, I find that it was manifestly erroneous for the jury to assess any amount because the record contains no evidence showing that Neal incurred any damages specifically as a result of Lafayette’s breach of its obligations of good faith and/or fair dealing under La. R.S. 22:1220.
Part A of the statute provides that an insurer’s breach of its duties of good faith and fair dealing shall cause the insurer to be liable for “any damages sustained as a result of the breach.” La. R.S. 22:1220 (currently § 22:1973) (emphasis added). Part B provides that the insurer’s knowing commission of any one of six specified acts constitutes a breach. Part C provides: “In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer |fiin an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.”
Essentially, La. R.S. 22:1220 punishes the bad-faith insurer by requiring it to pay additional damages, over and above the amount due under the insurance policy, when the insured can show that such damages have been incurred as a result of the insurer’s bad-faith actions, as well as subjecting the insurer to the possible imposition of penalties.[6] For example, in Clark v. McNabb, 04-0005, pp. 13-14 (La.App. 3 Cir. 5/19/04), 878 So.2d 677, 685-686, the Third Circuit held that an automobile insurer’s arbitrary and capricious failure to complete its investigation by obtaining the salvage value of the insured’s totaled vehicle entitled the insured to general damages for anxiety, mental anguish and the cost of storing the vehicle in his garage for the duration of the litigation, even though these damages were not provided for by the policy.
Thus, to recover damages under La. R.S. 22:1220 and/or to trigger a penalty award of double the amount of damages, the insured must first prove that actual damages resulted from the breach of the insurer’s obligations of good faith and/or *1151 fair dealing; if no such damages are proved, the maximum penalty that may be awarded under the statute is $5,000.[7] See Hall v. State Farm Mut. Auto. Ins. Co., 94-867, p. 7-8 (La.App. 3 Cir. 5/31/95), 658 So.2d 204, 206; In the Matter of Hanover Corp. v. State Farm Mut. Auto. Ins. Co, 67 F.3d 70, 76 (5 Cir. 10/4/95); Mercier v. Allstate Ins. Co., 06-9861(E.D.La.1/17/07), 2007 WL 210786. In the instant case, all of evidence presented by Neal, at trial related to its business loss |7under the policy; there was no evidence relating to damages specifically caused by Lafayette’s misrepresentation and/or its failure to pay the claim timely.
On appeal, Neal contends that the evidence of damages sustained as a result of Lafayette’s breach of its duties of under the statute consisted primarily of two elements, namely: Mr. Liteolffs expert testimony as to the amount of Neal’s continuing normal operating expenses; and the testimony of Michelle Leekert, Neal’s Director of Administration and Finance, that Neal lost the Martha Ann Samuel estate auction because Neal was not yet able to operate out of its Magazine Street location.[8] The majority accepts appellant’s argument, finding that the maximum amount of damages a reasonable fact finder could have awarded for Lafayette’s breach is $412, 312. I disagree.
The figure used by the majority, $412,312, represents the sum of two specific items of evidence: (1) Mr. Liteolffs testimony that Neal had incurred $400,496 in continuing normal operating expenses during the period of restoration, less the $215,884 co-insurance penalty Mr. Litcolff stated was applicable under the policy and the $1300 Lafayette had already paid to repair the damaged electrical pole on the Magazine Street premises; and (2) the $229,000 the majority estimated as being the profit Neal would have earned had it handled the auction of the Samuel estate. However, neither of these items are evidence of damages suffered by Neal as a result of Lafayette’s breach.
The first item was taken by the majority from Mr. Liteolffs testimony regarding Lafayette’s business income loss. As noted above, the Lafayette policy provides that the insurer will pay for “the actual loss of Business Income” the insured sustains due to the suspension of business operations during the period of restoration; it then defines “business income” as “net income” that would have been earned and “continuing normal operating expenses incurred.” The jury Rdetermined that Neal’s loss of business income was $253,699. As stated previously, the majority finds no manifest error in this determination; nor do I.
Assuming the jury based its finding upon Mr. Liteolffs testimony regarding net income, thereby rejecting or refusing to credit his other testimony regarding the continuing normal operating expenses incurred by Neal, that decision by the fact finder cannot be considered manifestly erroneous, for the same reasons that we find no manifest error in the jury’s determination of the amount of Neal’s business loss. More importantly, however, the jury’s failure to credit that particular evidence does not convert it from being evidence of business income loss under the policy (which it clearly was) into evidence of damages suf *1152 fered by Neal as a result of Lafayette’s arbitrary and capricious failure to pay the claim timely. Therefore, the majority’s inclusion of this business income loss evidence in its calculation of the highest possible amount that a reasonable fact finder could have awarded as damages under La. R.S. 22:1220 is not appropriate and is not supported by the record.
The other item used by the majority, Neal’s loss of the Samuel estate auction because of its inability to get the Magazine Street location up and running quickly enough, was never actually placed into evidence. Neal’s representative, Ms. Lec-kert, first testified that two heirs of Ms. Samuel, whom Ms. Leckert described as a “friend” of Neal who had purchased most of her estate from Neal’s auctions, came to Neal in early December, 2005, right after Neal had concluded the Mississippi auction. Ms. Leckert stated that she met with the heirs, who “wanted to have an auction as soon as possible,” and she “explained that things would be back to normal [at the Magazine Street location] very soon,” and Neal would be able to accommodate them; however, the heirs ultimately chose to use another local auction house. The plaintiffs counsel then asked Ms. Lec-kert why she was | gunable to convince the heirs to use Neal, and the transcript reflects that the question was objected to by Lafayette’s counsel and that the trial court sustained the objection. Ms. Leckert then testified, without any corroborating evidence, that the Samuel estate sold for $8,000,000, making it the largest estate sale ever held in New Orleans. Ms. Lec-kert was then asked what amount Neal would have made from that auction, and once again, the question was objected to and the objection was sustained. Ms. Lec-kert then responded to a question asking what Neal’s average percentage would be for an auction of that size; her response was it would depend on the particular contract, but Neal typically got at least the buyer’s premium, which ranged from 17.5% to 20%. Her response was then interrupted by another objection, which was again sustained by the trial court judge, who reiterated “Sustained ... It’s speculation.... I said it’s sustained.”
Combining this truncated testimony with figures taken from Mr. Litcolff s expert report as to Neal’s typical earnings from prior auctions, the majority concludes that Neal suffered an additional $229,000 in damages from the loss of the Samuel estate, which loss it attributes to Lafayette’s breach of its statutory duties of good faith and fair dealing. However, I cannot agree that this figure is supported by the record. First, the transcript clearly reflects that the reason the Samuel hems decided not to use Neal was never properly placed into evidence. Secondly, Ms. Leckert’s speculation as to the reason, even if she had been allow to testify, would have been unreliable and inadmissible hearsay, as she clearly had no personal knowledge of the reason and there was no showing that Ms. Samuel’s heirs were unavailable or otherwise unable to testify.[9]
Because I find that the record does not support either amount used by the majority to determine what a reasonable fact finder could have awarded in ^damages for Lafayette’s breach of La. R.S. 22:1220, I dissent from the majority’s reduction of the damage award under that statute. On the basis of the record, I would simply reverse the trial court’s award of damages under La. R.S. 22:1220 as being manifestly erroneous or clearly wrong.
*1153 The final issue addressed by the majority is statutory penalties. I agree that the trial court committed legal error by awarding penalties under both La. R.S. 22:1220 and under the amended version of La. R.S. 22:658. As the majority notes, Lafayette can legally be held liable for penalties under only one of these two bad-faith insurer statutes, whichever one provides the greater penalty. I also agree with the majority that the amended version of La. R.S. 22:658 is not applicable in this case because Neal’s claim arose before the effective date of the amendment. I dissent, however, from the majority’s assessment of a $1,322,022 penalty to Lafayette for its breach of La. R.S. 22:1220.
The majority calculates this amount by doubling the sum of the contractual damages awarded to Neal for its business income loss covered by the policy ($253,699) and the amount determined by the majority to be damages caused by Lafayette’s breach of its duties under La. R.S. 22:1220 ($412,312). However, the inclusion of the damages due under the policy in the determination of the penalty is incorrect. The jurisprudence indicates that the amount of penalties awardable under La. R.S. 22:1220 is based upon the damages sustained by the insurer’s breach of the duties of good faith and fair dealing imposed by the statute, not upon the total damages awarded. See: Hollier v. State Farm Mut Auto. Ins. Co., 01-0592, p. 5 (La.App. 3 Cir. 10/31/01), 799 So.2d 793, 797, writ denied 01-3163 (La.2/22/02), 810 So.2d 1135; Theriot v. Midland Risk Ins. Co., 95-227, p. 5 (La.App. 3 Cir. 11/2/95), 664 So.2d 547, 550, reversed on other grounds, 95-2895 (La.5/20/97),-11 694 So.2d 184; Hall v. State Farm Mut. Auto. Ins. Co., supra, 658 So.2d at 208.
However, because I find that the record does not contain proof of any damages sustained by Neal as a result of Lafayette’s breach of La. R.S. 22:1220, the appropriate penalty under that statute would be $5,000. Nevertheless, as Lafayette also violated La. R.S. 22:658 by failing to pay Neal’s claim within thirty days of receiving satisfactory proof of loss, the correct penalty is the larger of those that would be imposed by the two statutes. Calogero v. Safeway Ins. Co., 99-1625 (La.1/19/00), 753 So.2d 170, 174. Under the version of La. R.S. 22:658 applicable to this case (prior to the statute’s amendment, which went into effect August 15, 2006), the penalty assessed would be twenty-five percent (25%) of the damages sustained by Neal, without any provision for attorney’s fees or costs. Thus, I would reverse the award of penalties made by the trial court and award instead 25% of $253,699, or $63,424.75, in total penalties against Lafayette.
In conclusion, I would affirm the trial court’s award of $253,699 in damages due Neal under the Lafayette policy; reverse the trial court’s award of $500,000 in damages and $5,000 in penalties pursuant to La. R.S. 22:1220; reduce the trial court’s award of $376, 849.50 in penalties pursuant to La. R.S. 22:658 to $63,424.75; and reverse the trial court’s award of attorney’s fees and costs. Therefore, I would award plaintiff a total of $317,123.75, plus the applicable judicial interest.
Accordingly, for the reasons stated, I respectfully concur in part and dissent in part.

. This figure excludes the $96,507.83 in “extra expenses” (the cost of temporarily relocating Neal's business to Jackson, MS) that Lafayette had already paid.

. Notably, the “period of restoration” as defined in the policy does not end when the business operations actually resume at the covered location, but rather when the premises should be fit for them to resume.

. I note that neither interrogatory included La. R.S. 1220 B's language requiring that the insurer’s commission of one of the aforementioned acts be knowing. With regard to the misrepresentation, I believe the absence of the word "knowingly" was a legal error that may have tainted the interrogatory (i.e., affected the jury's answer to the question).

. Lafayette paid Neal’s relocation expenses and property damage in June, 2007.

. The jury answered “no” to question 3.

. As the Louisiana Supreme Court has noted, the insurer's liability for damages incurred by its breach of La. R.S. 22:1220 is mandatory; whereas the imposition of penalties under that statute is discretionary: "[W]here an insurer is found to have acted arbitrarily, capriciously, or without probable cause, the insurer shall be liable for damages as a result of the breach, and may be liable for penalties not to exceed two times the damages or five thousand dollars, whichever is greater. La. R.S. 22:1220, subd. A and C.” Calogero v. Safeway Ins. Co. of Louisiana, 99-1625, p. 5 (La. 1/19/00), 753 So.2d 170, 173 (emphasis in the original).

. The jury obviously did not understand the penalty provision of the statute; therefore, it erroneously found that Neal had incurred $500,000 in damages as a result of Lafayette’s breach of duty, yet found the applicable penalty to be $5,000.

. Appellant admits that the total amount of damages testified to in this regard falls below the amount ($500,000) found by the jury.

. In addition, the majority mischaracterizes Ms. Leckert's testimony; the assertion that she testified “that Lafayette's delay in payment of Neal’s claim caused Ms. Samuel's heirs to choose another auction company” is simply not supported by the record.